IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARIA KOVARIKOVA, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO 1:15-CV-2218 |
| v. | : | |
| | : | Honorable John E. Jones, III |
| WELLSPAN GOOD SAMARITAN | : | |
| HOSPITAL, and ROBERT LONGO, | : | |
| | : | |
| Defendants | : | |

 

# DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION OF THE COURT'S <u>ORDER DENYING SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

Introduction                                                          1

Procedural History                                                   1

Statement of Relevant Facts                                          3

Statement of Questions Involved                                      6

Legal Standard                                                       7

Argument                                                             8

    The alleged statements don't qualify as material misrepresentations   8

    Dr. Kovarikova has provided no evidence that she relied on the alleged   14
    Statements

    Dr. Kovarikova provided no evidence that she suffered financial harm   17
    by turning down Hershey Medical Center's job offer.

Conclusion                                                           21

# TABLE OF CITATIONS

## Statutes

Employee Retirement and Income Security Act ("ERISA") § 409(a).. 1, 8, 9, 10, 13

29 U.S.C. § 1109(a) ................................................................................. 9

Anti-Kickback Statute ............................................................................ 3

False Claims Act, 31 U.S.C. § 3729 ....................................................... 3

Pennsylvania Human Relations Act ............................................... 2, 3, 8

Stark Act, 42 U.S.C. § 1395nn .............................................................. 3

## Cases

*Diener v. Renfrew Ctrs., Inc.*, 2015 WL 567339 at *10 (E.D. Pa. Feb. 10, 2015) . 16

*Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 424 (3d Cir. 2013 ........... 15

*Fisher II*, 96 F.3d at 1537 ................................................... 6,9, 10, 11, 12

*Harsco Corp. v. Zlotnicki* , 779 F.2d 906, 909 (3d Cir. 1985) ................................ 7

*In re Unysis Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009) .......................................................................................... 8

*Kusma v. Merck & Co., Inc.*, 2009 WL 691992 at * (E.D. Pa. Mar. 13, 2009) ...... 17

*Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 179 F.3d 669, 677 (3d Cir. 1999) ............................................................................................ 7

*Mushalla v. Teamsters Local No. 863 Pension Fund*, 300 F.3d 391, 396 (3d Cir. 2002) .......................................................................................... 11

*Rashid v. First Energy Corp. Pension Plan*, 183 Fed. Appx. 257, 258 (3d. Cir. 2006 .......................................................................................... 11

*Shook v. Avaya*, 625 F.3d 69, 73 (3d Cir. 2010) ...................................... 19

*Unisys*, 579 F.3d at 228 ..................................................................... 14

**Rules**

Fed. R. Civ. P. 12(f) ...................................................................................... 2

M.D. Pa. Local Rule 7.8(b)(2)....................................................................... 22

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR
RECONSIDERATION OF THE COURT'S
ORDER DENYING SUMMARY JUDGMENT**

## I.   INTRODUCTION

Through the current motion, Defendants Good Samaritan Hospital and

Robert Longo seek reconsideration of the Court's Memorandum and Order

denying Defendants' Motion for Summary Judgment. As explained in more detail

below, the Court's rulings regarding the genuinely undisputed facts required that

the Court find that Plaintiff, Dr. Daria Kovarikova, failed to adduce evidence that

Defendants violated § 409(a) of the Employee Retirement and Income Security Act

("ERISA").

Accordingly, Defendants respectfully request that the Court reconsider its

previous order and grant Defendants' Motion for Summary Judgment.

## II.   PROCEDURAL HISTORY

On November 19, 2015, Dr. Daria Kovarikova, a former employee of Good

Samaritan Hospital, filed a five-count Complaint challenging changes that Good

Samaritan made to its pension plan in 2014. Specifically, Good Samaritan decided

to stop contributing to its defined benefit pension plan for all employees under 60

years old at the time and instead provided these employees with a defined

contribution pension plan moving forward. Dr. Kovarikova, who was 59 years old

at the time, alleged that the change lowered the value of her Good Samaritan retirement benefits.

Dr. Kovarikova's original Complaint named as defendants Good Samaritan, Robert Longo (the hospital's former Chief Executive Officer), and WellSpan Health, a health care system that became associated with Good Samaritan over a year after the events alleged in Dr. Kovarikova's Complaint. The original Complaint[1] asserted the following claims: violation of ERISA § 409, 29 U.S.C. § 1109; violation of the ADEA, 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; claims under Pennsylvania common law for breach of contract and constructive fraud; and a claim for violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*

On February 22, 2016, Dr. Kovarikova filed the Amended Complaint,[2] which asserted the same five claims from the original Complaint, plus additional Pennsylvania common law claims and claims under the Stark Act, 42 U.S.C. § 1395nn, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the False Claims Act, 31 U.S.C. § 3729.

On March 4, 2016, Defendants filed a Motion to Strike the Amended Complaint under Rule 12(f) of the Federal Rules of Civil Procedure.[3] The Court

---

[1] (Doc. 1).
[2] (Doc. 16).
[3] (Doc. 17).

issued a Memorandum and Order on April 7, 2016,[4] which struck all of the claims added in the Amended Complaint.

On April 20, 2016, Defendants filed a Motion to Dismiss the Amended Complaint,[5] seeking dismissal of the claims from the original Complaint. By Order dated October 19, 2016, the Court granted in part and denied in part Defendants' Motion to Dismiss the Amended Complaint.[6] Specifically, the Court refused to dismiss the ERISA claim against Good Samaritan and Longo, but dismissed all other claims, including all claims against WellSpan Health.

Following discovery, Good Samaritan and Longo moved for summary judgment.[7] On March 8, 2018, the Court denied that motion.[8] Through the current motion, Good Samaritan and Longo seek reconsideration of that Order and an order granting the previously filed Motion for Summary Judgment.

## III.   STATEMENT OF RELEVANT FACTS

In the memorandum and order denying summary judgment, Your Honor found that the following facts are not genuinely disputed:

Dr. Daria Kovarikova worked as a physician for Good Samaritan Hospital from April of 1997 through October of 2016. During the first half of 2013, Penn

---

[4] (Doc. 25).
[5] (Doc. 32).
[6] (Doc. 43).
[7] (Doc. 51).
[8] (Doc. 62).

State Hershey Medical Center discontinued its residency program at Good Samaritan. After that, Dr. Kovarikova interviewed for a position with the Family Residency Program at Hershey Medical Center. Although Hershey Medical Center offered her a position, Dr. Kovarikova declined the offer and decided to remain employed with Good Samaritan Hospital.

"Sometime later," Good Samaritan offered Dr. Kovarikova and other physicians involved with the former residency program a $20,000 retention bonus. In exchange for receiving the extra $20,000, the physicians agreed to remain employed with Good Samaritan through at least June 30, 2014.[9]

Your Honor's summary judgment ruling held that there are genuine disputes of fact related to what, if any, representations Good Samaritan agents made related to the retention bonus program. On the one hand, Defendants deny making any representations to Dr. Kovarikova that her benefits would never change.

Dr. Kovarikova testified, however, that "in anticipation of presenting the retention agreement," Kim Feeman (Good Samaritan's Chief Operating Officer) and Dr. Robert Shaver (Good Samaritan's Vice President of Medical Affairs) "met with the faculty to discuss the content of the forthcoming agreement."[10] During these meetings—Dr. Kovarikova testified—the faculty asked Dr. Shaver if the

---

[9] (Doc. 62, pp. 1-2).
[10] (*Id.* at p. 2).

faculty members were "going to keep [their] benefits. . . ."[11] According to Dr. Kovarikova, Dr. Shaver told the faculty members, "[T]here will be no changes for worse, only changes for the better. . . ."[12]

Dr. Kovarikova signed the retention bonus on July 1, 2013. Before handing in the signed agreement, however, she wrote the following on the agreement: "Providing my current work structure, income and benefits continue unchanged."[13]

Kathy Harrison, Good Samaritan's Director of Physician Services, confronted Dr. Kovarikova about her handwritten note when she handed in the agreement. During this conversation, Dr. Kovarikova testified, Harrison "assured [Dr. Kovarikova] there definitely will be no change" to her benefits.[14]

All parties agree that Good Samaritan changed its defined benefit pension plan effective July 1, 2014. Those changes excluded Dr. Kovarikova from accruing additional benefits under the defined benefit plan. Dr. Kovarikova alleges that Dr. Shaver's and Harrison's alleged statements violated Defendants' fiduciary duties under ERISA § 409(a).

Importantly, though, Your Honor's opinion correctly held that Dr. Kovarikova failed to present any evidence that Good Samaritan was seriously considering changing the defined benefit plan at the time of the alleged statements

---

[11] (Deposition of Dr. Daria Kovarikova at 29:18-20, (Doc. 51-1, p. 9).
[12] (*Id.* at 29:21-25 (Doc. 51-1, p. 9)).
[13] (June 25, 2013 Agreement (Doc. 51-2, p. 28)).
[14] (Kovarikova Depo. at 26:13 to 27:2 (Doc. 51-1, p. 9)).

about her benefits. Again, Dr. Kovarikova alleges that Dr. Shaver and Harrison made these statements after Penn State terminated the Good Samaritan Residency program during the first half of 2013 but no later than when Dr. Kovarikova signed the retention bonus agreement on July 1, 2013.

Good Samaritan, however, didn't even begin seriously contemplating changes to the defined benefit retirement program until February of 2014, at the absolute earliest.[15] Thus, any statements that Dr. Kovarikova claims Dr. Shaver or Harrison made about that program "were made prior to the proposed Plan changes being seriously considered."[16]

As explained below, these undisputed facts required that the court grant summary judgment to Defendants on Plaintiff's ERISA claim.

## IV.   STATEMENT OF QUESTIONS INVOLVED

1.   Whether summary judgment should be granted because it is undisputed that Defendants weren't seriously contemplating changes to the ERISA plan at the time of Dr. Shaver's and Harrison's alleged statements to Dr. Kovarikova?

**Suggested Answer:** Yes.

---

[15] (*See* March 8, 2018 Order, Doc. 62, p. 3 ("On February 19, 2014, [Conrad Siegel Actuaries] provided [Good Samaritan] with a time table for changing from a defined benefit plan to a defined contribution plan."); *see also id.* at p. 10 ("Consideration becomes serious when the subject turns to the practicalities of implementation.") (quoting *Fisher v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1538 (3d Cir. 1996) (reversing judgment in favor of the plaintiffs based on evidence that all plaintiffs retired before the company made any misrepresentations)).
[16] (Doc. 62, pp. 10-11).

2.   Whether summary judgment should be granted because Dr. Kovarikova failed to adduce evidence that she relied on Dr. Shaver's or Harrison's alleged statements?

**Suggested Answer:** Yes.

3.   Whether summary judgment should be granted because Dr. Kovarikova failed to adduce any evidence that Good Samaritan's change to its defined contribution plan caused her financial harm?

**Suggested Answer:** Yes.

## V.   LEGAL STANDARD: MOTION FOR RECONSIDERATION

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). Accordingly, a motion for consideration may only be granted based upon "(1) an intervening change in the controlling law," "(2) the availability of new evidence . . . " or "(3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 179 F.3d 669, 677 (3d Cir. 1999).

Here, Defendants' motion focuses exclusively on the Court's decision denying summary judgment. Specifically, Defendants' position is that the Court made clear legal errors by holding that Dr. Kovarikova has adduced sufficient evidence for a jury to conclude that Defendants made material misrepresentations and that she detrimentally relied on the alleged material misrepresentations. Instead, the genuinely undisputed facts that the Court recognized required that the

Court rule that Plaintiff had failed to adduce evidence of a material dispute regarding these topics. Accordingly, Defendants request that the court enter an order reconsidering its prior ruling and granting Defendants' Motion for Summary Judgment.

## VI.   ARGUMENT

A.   <u>The alleged statements don't qualify as material misrepresentations.</u>

The lone remaining claim in this case is Dr. Kovarikova's allegation that Good Samaritan and Longo breached their fiduciary duty to her in violation of ERISA § 409(a). *See* 29 U.S.C. § 1109(a). To establish such a claim, as the Court correctly noted, the plaintiff must demonstrate that the defendant materially misrepresented something about the plaintiff's ERISA covered benefits.[17] *See In re Unysis Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009).

In the present case, it is undisputed that neither Good Samaritan nor Longo "made any affirmative misrepresentations."[18] Instead, the Court's opinion focuses on the alleged statements that Dr. Kovarikova claims Dr. Shaver and Harrison made about her benefits leading up to her signing the retention bonus agreement on July 1, 2013.

---

[17] (*See* Doc. 62, p. 8).
[18] (Doc. 62, p. 10).

Thus, the relevant issue is whether these alleged statements constitute material misrepresentations. The answer is no.

As the Court noted in its opinion, to establish material misrepresentation the plaintiff must demonstrate that the defendant was seriously considering a specific proposal to change its ERISA plan when it led the plaintiff to believe otherwise.[19] *See Fisher v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1539 (3d Cir. 1996) (*Fisher II*).

The Court's opinion explicitly held that Defendants were not seriously considering any changes to the defined benefit plan until February of 2014, at the absolute earliest.[20] Dr. Kovarikova, however, testified that Dr. Shaver's and Harrison's alleged statements of her benefits occurred no later than when she signed the retention bonus agreement on July 1, 2013. In the court's words: "It bears pointing out that neither side argues that the Plan changes were under serious consideration *prior to* the misstatements made to Kovarikova."[21]

Accordingly, it is undisputed that Defendants were not seriously considering changing the defined benefit plan when Dr. Kovarikova claims Dr. Shaver and Harrison suggested that her benefits would not change. Because Defendants

---

[19] (*See* Doc. 62, p. 9).
[20] (*See* Doc. 62, p. 3 ("On February 19, 2014, [Conrad Siegel Actuaries] provided [Good Samaritan] with a time table for changing from a defined benefit plan to a defined contribution plan.")).
[21] (*Id.* at p. 14).

weren't considering changing the defined benefit plan in 2013, then Dr. Shaver's and Harrison's alleged statements weren't misrepresentations at all, and certainly don't qualify as material misrepresentations.

The Court, however, determined that because Defendants later decided to change Dr. Kovarikova's defined benefit plan, the jury would have to decide whether Defendants unreasonably delayed in notifying Dr. Kovarikova of the proposed change, given Dr. Kovarikova's perception that the plan wouldn't change. According to the Court, that "is a disputed question of fact best suited for a jury."[22]

With all due respect, this is clear legal error. ERISA § 409(a) imposes no duty on a fiduciary to go back and correct a prior statement about benefit changes if the statement was true at the time it was made. As the Third Circuit Court of Appeal has held, "in any case where the misrepresentation is the statement that no change in benefits is under consideration, the only factor at issue is the degree of seriousness with which the change was in fact being considered. This factor controls the materiality test." *Fisher II*, 90 F.3d at 1538.

In other words, a material misrepresentation occurs only if the fiduciary leads a beneficiary to believe that the fiduciary isn't contemplating plan changes when, in fact, the fiduciary is seriously considering such a change. *See Mushalla v.*

---

[22] (Doc. 62, p. 14).

*Teamsters Local No. 863 Pension Fund*, 300 F.3d 391, 396 (3d Cir. 2002). The opposite is true as well: If the fiduciary isn't seriously considering changing the plan when the beneficiary is led to believe the plan will not be changed, then no material misrepresentation has occurred, even if the plan is later changed. *See Rashid v. First Energy Corp. Pension Plan*, 183 Fed. Appx. 257, 258 (3d. Cir. 2006) (affirming summary judgment for fiduciary who told the plaintiff that no early retirement plan was contemplated but began seriously contemplating such a plan four months later).

Because "ERISA does not impose a duty of clairvoyance on fiduciaries," an "ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan." *Fisher v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993) (*Fisher I*); *accord Chichelo v. Hoffman-La Roche, Inc.*, 28 Fed. Appx. 155, 157 (3d Cir. 2002) ("Under the law enunciated by this court, the employee cannot recover under ERISA for failure of the employee-plan administrator to give notice of impending changes unless the changes were under 'serious consideration.' ").

*Fisher II*, the seminal Third Circuit case regarding serious consideration, demonstrates the error in the court's analysis. In that case, a class of plaintiffs sued under ERISA for breach of fiduciary duty alleging that Philadelphia Electric Company ("PECO") had misled them about its plans to implement an early retirement program. Specifically, the plaintiffs alleged that on December 13, 1999,

PECO's chief executive officer had indicated the company wasn't seriously considering an early retirement program. *See Fisher II*, 96 F.3d at 1537. In reliance on that representation, the plaintiffs then retired between January 1, 1990 and April 1, 1990. *See id.* at 1543, fn. 4. Then on April 13, 1990, the CEO announced an early retirement program that the plaintiffs would have been eligible for had they not already retired. *See id.* at 1537.

The Third Circuit, however, granted judgment to PECO, ruling that the company wasn't considering the early retirement plan "until April 7, 1990." *Id.* at 1542. Thus, the plaintiffs couldn't predicate a breach of fiduciary duty on the CEO's December 13, 1999 statement because PECO wasn't seriously considering an early retirement program at that time. *See id.* at 1541 ("The district court was equally correct to dispose of [the CEO's] statements during his speeches to employees on December 13, 1999.").

Only those employees "who asked about a potential early retirement plan after serious consideration began on April 7, 1990, but before the plan's formal announcement on April 19, 1990," could establish that the company had materially misled them. *Id.* at 1543. But because none of the plaintiffs alleged that, the Third Circuit granted judgment to PECO. *See id.*; *accord Peterson v. AT&T*, 127 Fed. Appx. 67, 73 (3d Cir. 2005) (affirming summary judgment for plan administrator

because the later-implemented retirement benefit wasn't under serious consideration when the plaintiffs alleged the defendant lured them into retiring).

Similarly, in the present case, Good Samaritan didn't seriously consider changing the defined benefit plan until February of 2014, at the absolute earliest— as the court has held. Thus, to establish that a fiduciary made a material misrepresentation, Dr. Kovarikova would have to provide proof that between February and May of 2014 (when Good Samaritan announced the changes) she was told or led to believe that Good Samaritan wasn't contemplating changing the defined benefit plan.

Dr. Kovarikova, however, presented no such evidence. Instead, just like the failed claims of the plaintiffs in *Fisher II*, she bases her claim on representations that she alleges were made to her months before Good Samaritan began seriously contemplating changes to the benefits program.

In sum, a plaintiff alleging breach of fiduciary duty under ERISA § 409(a) must demonstrate that an ERISA fiduciary led her to believe that the plan at issue wasn't going to be changed, when in fact the fiduciary was seriously considering making changes. Here, Dr. Kovarikova alleges that Dr. Shaver and Harrison in 2013 led her to believe that her defined benefit plan wouldn't be changed. It is undisputed, however, that Good Samaritan wasn't seriously considering making

any changes to the defined benefit plan at the time of these alleged statements—and didn't seriously making such changes for at least another seven months.

Because the facts taken in the light most favorable to Dr. Kovarikova do not suggest that Defendants made any material misrepresentations, then the court made a clear error of law by denying Defendants' Motion for Summary Judgment.

B.   Dr. Kovarikova has provided no evidence that she relied on the alleged statements.

Even if Dr. Kovarikova had presented a triable issue regarding the issue of material misrepresentation, she would also have to provide evidence that she detrimentally relied on Harrison's or Dr. Shaver's alleged statements. *See Unisys*, 579 F.3d at 228 (requiring proof that "the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure").

Your Honor's opinion concluded that Dr. Kovarikova had made this showing through evidence that she turned down an offer of employment at Hershey Medical Center.

Obviously, an action isn't taken in reliance on a statement if the person takes the action before the statement is made. Thus, Dr. Kovarikova—who, as the plaintiff in this case, bears the burden of proof—must provide the court with some evidence that Harrison or Dr. Shaver made the alleged statements about her benefits *before* she turned down Hershey Medical Center's employment offer. Without that evidence, a reasonable jury could not conclude that Dr. Kovarikova

turned down the offer in reliance on Harrison's or Dr. Shaver's statements, and

Defendants would be entitled to summary judgment. *See Edmonson v. Lincoln*

*Nat'l Life Ins. Co.*, 725 F.3d 406, 424 (3d Cir. 2013) (holding that ERISA requires

that the plaintiff demonstrate that the fiduciary's breach of its duty proximately

caused the plaintiff's injury).

In this regard, Harrison's statements could not have motivated Dr.

Kovarikova's decision to turn down the employment offer. Again, Dr. Kovarikova

testified that when she turned in the signed retention bonus agreement on July 1,

2013, Harrison assured her that her benefits wouldn't change. By that time,

however, Dr. Kovarikova had already turned down Hershey Medical Center's

offer, as Your Honor noted in the memorandum and opinion.[23] Because Harrison's

alleged assurance occurred *after* Dr. Kovarikova turned down the offer, Dr.

Kovarikova could not have relied on that assurance when deciding whether to

accept or reject Hershey's offer.

Dr. Shaver's alleged statements present a slightly closer call. Dr. Kovarikova

hasn't indicated when these alleged statements occurred, other than her testimony

---

[23] (*See* Doc. 62, pp. 1-2 (holding that Dr. Kovarikova turned down Hershey
Medical Center's offer and then "[s]ometime later" Good Samaritan offered her the
retention bonus); *see also* Kovarikova Depo. at 41:18 to 42:4 (Doc. 51-1, pp. 12-
13) (noting that Dr. Kovarikova interviewed with Hershey Medical Center before
she received the June 25, 2013 written retention bonus offer)).

that Dr. Shaver made these statements during Residency Faculty meetings after Penn State terminated Good Samaritan's residency program.[24]

Dr. Kovarikova, however, is the plaintiff in this case. As a result, she bears the burden of demonstrating that she detrimentally relied on Dr. Shaver's alleged statements about her benefits when she decided to reject Hershey Medical Center's job offer. *See Diener v. Renfrew Ctrs., Inc.*, 2015 WL 567339 at *10 (E.D. Pa. Feb. 10, 2015) (granting summary judgment due to the plaintiff's failure to adduce evidence that, if believed, would establish detrimental reliance).

That, in turn, requires evidence that Dr. Shaver made the statement *before* Dr. Kovarikova rejected the offer. Dr. Kovarikova, however, has provided no evidence that Dr. Shaver made the alleged statements before she turned down the offer, and Dr. Kovarikova didn't testify that she turned down the offer because of Dr. Shaver's statement.

To the contrary, Dr. Kovarikova's testimony suggests that she didn't even take her benefits at Good Samaritan into account when she turned down Hershey Medical Center's offer. Specifically, Dr. Kovarikova testified that she decided to remain employed at Good Samaritan because, in her words: "I loved that place. I knew everybody in the hospital."[25] Regarding the offer from Hershey Medical Center, Dr. Kovarikova could only recall that the offered salary was "comparable"

---

[24] (*See* Kovarikova Depo. at 29:9-29 (Doc. 51-1, p. 9)).
[25] (Kovarikova Depo. at 44:18-21 (Doc. 51-1, p. 13)).

and that it would have taken her three years to vest in Hershey's retirement plan.[26]

Dr. Kovarikova has presented no other evidence about what those benefits would

have been at Hershey Medical Center.[27]

Based on this record, no reasonable jury could conclude that Dr. Kovarikova

detrimentally relied on either Harrison's or Dr. Shaver's alleged statements when

she decided to remain at Good Samaritan instead of accepting Hershey Medical

Center's job offer. Accordingly, the Court should reconsider its previous Order and

grant Defendants' summary judgment motion.

C.    Dr. Kovarikova provided no evidence that she suffered financial harm by
turning down Hershey Medical Center's job offer.

Even if Dr. Kovarikova had adduced evidence that she relied upon Dr.

Shaver's or Harrison's alleged statements, that still wouldn't be enough to require

a jury trial in this case. Instead, Dr. Kovarikova must also provide proof that her

reliance on those statements financially harmed her. *See Kusma v. Merck & Co.,*

*Inc.*, 2009 WL 691992 at * (E.D. Pa. Mar. 13, 2009) ("In order to demonstrate

injury, Plaintiff must show that she was placed in a worse position because of the

alleged material misrepresentations.").

_____

[26] (*Id.* at 43:1-13 (Doc. 51-1, p. 13) ("So Hershey time, to get vested, if you start a
new job, was only three years.")).
[27] To be fair, Dr. Kovarikova also mentioned that Hershey Medical Center offered
health insurance for pets, but there is no record evidence that Dr. Kovarikova
owned a pet or that she considered that offer when deciding whether to accept
Hershey's offer. (*See id.* at 43:17-24 (Doc. 51-1, p. 13)).

Again, Dr. Kovarikova argues that she turned down employment with Hershey Medical Center based on Dr. Shaver's and Harrison's alleged statements. As a result, she must demonstrate that she lost money because of that reliance. That, in turn, requires proof that Dr. Kovarikova would have been better off financially had she gone to work for Hershey Medical Center than she was by remaining employed with Good Samaritan.

Proving that is no easy task. After all, Good Samaritan paid Dr. Kovarikova a $20,000 retention bonus that she wouldn't have been eligible for had she left to work for Hershey Medical Center. Plus, according to her own interrogatory answers, Dr. Kovarikova will receive approximately $260 per month in retirement benefits from Good Samaritan's defined contribution plan that she obtained by remaining employed with Good Samaritan after the change to her retirement benefits in June of 2014.[28]

Additionally, Dr. Kovarikova left employment with Good Samaritan to work at the Veteran's Affairs Hospital in Lebanon, starting in October of 2016. Thus, Dr. Kovarikova must demonstrate that the compensation she would have received working for Hershey Medical Center between July of 2014 (when the change to her retirement plan occurred) and October of 2016 (when she quit working at Good Samaritan) would have exceeded the $20,000 retention bonus and the defined

---

[28] (*See* Kovarikova Interrogatory Answer No. 11 (Doc. 51-1, p. 38)).

contribution benefits she obtained by remaining employed at Good Samaritan during this period.

Dr. Kovarikova, however, has provided no evidence that her compensation package at Hershey Medical Center would have exceeded this. Although she testified briefly during her deposition about the offer,[29] that testimony didn't suggest that Hershey's offer was sufficiently generous to offset the $20,000 retention bonus she received by remaining at Good Samaritan.

Dr. Kovarikova, however, doesn't link her damages claim to the Hershey Medical Center position at all. Instead, Dr. Kovarikova seeks to recover the difference between the retirement benefits she would have received had she been permitted to continue accruing benefits through the define benefit retirement plan after July 1, 2014 and what her actual retirement benefits end up being.[30]

But the change to Dr. Kovarikova's Good Samaritan benefits isn't related to her decision to remain employed at Good Samaritan. After all, Good Samaritan could have changed the plan had Dr. Kovarikova remained employed at Good Samaritan or if she left to work at Hershey Medical Center. Thus, she cannot prove financial harm based on the change in her Good Samaritan retirement benefits. *See Shook v. Avaya*, 625 F.3d 69, 73 (3d Cir. 2010) (holding that the "mere expectation of continued benefits is not enough" to demonstrate detrimental reliance).

---

[29] *See supra* at Part IV.B (citing Kovarikova Depo. at 43:1-13 (Doc. 51-1, p. 13).
[30] (*See* Kovarikova Interrogatory Answer No. 11 (Doc. 51-1, p. 38)).

Because Dr. Kovarikova failed to provide any evidence that she suffered financial harm as a result of turning down Hershey Medical Center's offer, she hasn't provided sufficient evidence that a reasonable jury could rely upon to conclude that she relied on Dr. Shaver's and Harrison's statements to her detriment.

# VII.   CONCLUSION

In summary, the Court should reconsider its previous denial of Defendants'
Motion for Summary Judgment. Even viewing the facts in the light most favorable
to Dr. Kovarikova, it is beyond dispute that she hasn't provided evidence
suggesting that Defendants made a material misrepresentation, that she relied on
any such misrepresentations, or that she was financially harmed by relying on such
statements. Absent proof on those topics, no reasonable jury could conclude that
Defendants breach their fiduciary duties to Plaintiff.

Accordingly, Defendants request that the Court enter an Order reconsidering
its prior ruling and granting summary judgment to Defendants.

Respectfully Submitted,

*/s/ Peggy M. Morcom*
Peggy M. Morcom, Esquire
ID No.: 92463
Morcom@buzgondavis.com
Buzgon Davis Law Offices
525 S. 8th Street
Lebanon, PA 17042
(717) 454-0804
*Attorney for Defendants Good Samaritan Hospital*
*and Robert Longo*

## <u>WORD COUNT CERTIFICATION</u>

I, Peggy Morcom, hereby certify that the word count function for this
document indicates that the document contains 4,447 words—not counting the
cover sheet, table of contents, table of authorities, word count certification, and
certificate of service. *See* M.D. Pa. Local Rule 7.8(b)(2) (limiting briefs to no more
than 5,000 words).

Respectfully Submitted,

*/s/ Peggy M. Morcom*
Peggy M. Morcom, Esquire
Pa. Bar No. 92463
Morcom@buzgondavis.com
Buzgon Davis Law Offices
525 S. 8th Street
Lebanon, PA 17042
(717) 454-0804
*Attorney for Defendants Good Samaritan Hospital
and Robert Longo*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 29th day of March, 2018, a true and correct

copy of the foregoing, Defendants Good Samaritan Hospital and Robert Longo's

Brief in Support of Their Motion for Reconsideration has been filed with the

Court's CM/ECF system and is available for downloading:

Jason H. Ehrenberg, Esq.
Bailey & Ehrenberg, PLLC
1015 18th Street, N.W., Suite 204
Washington, DC 20036
jhe@becounsel.com

Jaromir Kovarik, Esq.
KTHL Law Offices, P.C.
412 Chestnut Street, Suite 100
Lebanon, PA 17042
Jaromir.kovarik@kthl.net

David J. Freedman, Esquire
Barley Snyder, LLP
126 East King Street
Lancaster, PA 17602
dfreedman@barley.com

*/s/ Peggy M. Morcom*
Peggy M. Morcom, Esquire
ID No. 92463
Morcom@buzgondavis.com
Buzgon Davis Law Offices
525 S. 8th Street
Lebanon, PA 17042
(717) 454-0804
*Attorney for Defendants Good Samaritan Hospital
and Robert Longo*